SELLERS ET AL VS CATRON.

Opinion delivered October 19, 1904.

1. *Contracts—Void—Release from Arrest—Illegal Consideration.*

A verbal agreement for the delivery of certain cattle to be retained and

kept unless the sum of $165.00 was paid within thirty days, made upon the condition that a third party should be released from arrest, is void being based upon an illegal consideration.

2. *Contract—Annulled by Breach—Tender—Unnecessary.*

Where certain cattle were turned over to defendant by plaintiff to secure the release of a third person from arrest, under an agreement that said cattle were to become the property of defendant if not redeemed by payment of $165.00 within thirty days; and afterward within less than thirty days defendants re-arrest the third party and plaintiffs as well and by reason of such acts and intimidation plaintiffs agreed to surrender the cattle to defendant and to leave the country; *Held*, that such acts by defendant constituted a breach of original agreement and no tender of the specified sum was necessary to entitle plaintiffs to recover the cattle by replevin.

3. *Replevin—Demand—When Unnecessary.*

When in a replevin suit, the defendant sets up a claim of ownership of the property sued for, and the proof showed his taking of the property to have been wrongful, no demand for possession was necessary before bringing the action.

Appeal from the United States Court for the Western District.

CHARLES W. RAYMOND, Judge.

Action by J. A. Sellers and another against Hiram Catron. Judgment for defendant. Plaintiffs appeal. Reversed.

*De Roos Bailey* and *Thomas H. Owen*, for appellants.

*N. A. Gibson*, for appellee.

CLAYTON, J. This is an action of replevin brought by the plaintiffs (appellants) to recover from the defendant 12 head of cattle. The complaint and affidavit are in the usual form.

The answer denies that the plaintiffs are the owners of said cattle, or have the right to the possession of them. It admits the possession by the defendant of seven head, but avers that the plaintiffs, before the bringing of this suit, in the presence of the defendant, sold said cattle to one Watson, who immediately thereafter sold them to defendant in the presence of the plaintiffs, and delivered the possession of them to him (the defendant). Upon the issue thus joined the case was tried to the jury. At the conclusion of the plaintiffs' testimony the defendant moved for peremptory instruction, which was sustained, and the jury was directed to find their verdict for the defendant.

The testimony for the plaintiffs, which, as before stated, was all that was taken, established the following facts: The plaintiffs both testify that they were the owners of the cattle, and that they were in their possession when taken by defendant; and, as there was no testimony offered to sustain the averments of the answer, these facts, together with all others established by plaintiffs' proof, must be taken as true. And this is what the court did. The peremptory instruction was based solely on the fact that the sum of $165, arising from a certain contract hereafter to be set out, had not been tendered, and that no demand had been made for the cattle, before the suit was brought. It was further shown by the proof that on October 6, 1899, the defendant, Catron, accompanied by two other men, went to the home of plaintiffs and arrested the man Watson, claimed in the answer to have been the defendant's grantor of the cattle. The defendant claimed to Watson that certain other cattle which he (Watson) had previously sold to him had been taken away from him; that they were stolen property. Watson desired time to straighten the matter up. The defendant said: "All I want is my money." The defendant then proposed to the plaintiffs that, if they would allow the cattle in controversy to stand good as a bond for 30 days, he would turn Watson loose from the

arrest. It was finally agreed that plaintiffs would turn the cattle over to defendant, with the understanding that if either Watson or plaintiffs should pay to defendant, within the 30 days, the sum of $165—the sum that defendant claimed he had paid Watson for the cattle which had been taken from him as stolen property—the cattle of plaintiffs should be turned back to plaintiffs, but, if they failed in this, the cattle were to belong to defendant. With this understanding they were turned over to the defendant. Three of the cows, with their calves, however, were left in the possession of one Mr. Jones, a brother-in-law to plaintiffs, with the agreement that plaintiffs were to have the milk from the cows for the benefit of their family. The balance of the cattle were driven away by defendant, and Watson was released from his arrest. About one week after the transactions above set forth, the defendant and three other men, one of whom claimed to be a deputy marshal, all armed with guns, came to the home of plaintiffs and inquired for Watson, who had just left the premises. They searched for him, and, on failing to find him, proceeded to arrest both of the plaintiffs on the plea that they were harboring a thief. The plaintiffs then demanded of them to produce their authority to make the arrest. They replied that they had "papers for the arrest of Jim (one of the plaintiffs) and Watson, and came to take the whole outfit, dead or alive." They afterwards claimed that they had warrants for the arrest of all, and would produce them on the following morning. The warrants were never produced. The plaintiffs were separated from their children and held in arrest under guard all night. During the night the defendant proposed to them that, if they would turn the cattle over to them and leave the country, they would not serve the papers on them, but, if not, they would serve the papers on them the next morning and take them to jail. The following morning Watson was arrested, and the proposal made during the night repeated. It was testified to that the cattle to be thus turned over to defendant included those that

had been driven away the week before. The proposal was finally accepted by the plaintiffs, and all except Watson were released, and the balance of the cattle—those which had been left with Jones—were driven away by the defendant and those with him. One of the plaintiffs (Mrs. Sellers), on being asked, "Why did you agree to release your claim on the cattle and turn them over to Catron?" replied, "Because I didn't want to be brought down and put in jail." It appears that Watson was not prosecuted on the alleged charge of cattle stealing.

Upon the pleadings and facts above shown was it necessary for the plaintiffs, before bringing their suit, to tender to defendant the $165 agreed to in the first contract? If, under the facts and circumstances of this case, the original contract upon which the possession of the cattle was obtained was a valid one, and had not been annulled by the defendant before the 30 days provided by the agreement in which the cattle could have been redeemed, it would have been necessary, before bringing suit, for the plaintiffs to have tendered the money, because the very terms of the agreement provided that at the expiration of 30 days, if the money were not paid, the cattle were to become the property of the defendant, and the title and right of possession would have vested in him. And if the agreement were a valid one, and plaintiffs failed to show payment of the money or a tender of it within that time, that would end the case in favor of the defendant. But if the agreement were an unlawful one and void, or if, lawful in the beginning, it had been afterward, and before its termination, annulled by words or conduct of the defendant, no tender of the money before bringing suit was necessary, because in such case nothing would be due to the defendant. If the contract requiring the payment of the money were void, or had been rendered void, it is clear that, as there was nothing else to create a debt between the parties, there was nothing owing, and therefore nothing to tender. It becomes

necessary, then, for us to determine whether or not the original agreement in this case was a valid one, and, if so, had there been a breach of it by the defendant before the 30 days given by its terms for the redemption of the cattle had expired? And at the very start we must consider, as far as the case now presented is concerned, that the title to the cattle was in the plaintiffs. They have testified to it, and there is no evidence to the contrary. Of course, if the cattle had been stolen by Watson from some third party and sold to the defendant, neither the plaintiffs nor the defendant would have title. But there was no proof of this. Neither was there any proof that Watson was a thief, or that the defendant had any valid claim to the property. It is true that in his answer he avers ownership, but he made no proof of that or any other fact. His only right to the possession, therefore, rests on the agreement. And as we are to consider that the cattle belonged absolutely to plaintiffs, the consideration for the agreement was solely for the benefit of Watson, to secure his release from an arrest founded upon a charge of larceny. If it shall be said that the right to redeem the cattle for the sum specified, independent of the release of Watson, was a valuable consideration, the answer is that the cattle were their own, and neither they nor Watson owed the defendant anything. Leaving the benefit to Watson out of the agreement, and it would stand thus: "You take my cattle and hold them for thirty days, and if at the end of that time I do not redeem them with the sum of $165, my cattle shall be yours." The 30 days expire, and he holds my cattle as his own. What has he paid for them? Where is the consideration to support such a contract? If the contract had been thus: "These cattle that you claim now in your possession are stolen property. I have an interest in them. If you will turn them over to me, I will hold them for 30 days, in which time, if it shall turn out they were stolen, you may redeem them for $165, and, if not redeemed, I will keep the cattle, but, if it turns out that they were not stolen, you shall have them

returned to you"—it would have been a different proposition. But this was not the agreement. The defendant was to have the money or the cattle at all events. He was to hold them as his own, or be paid $165. It turns out, as far as it is shown, that the cattle were not stolen, and that the defendant still holds them, claiming them as his own, and he has parted with no consideration for them. And therefore the validity of the agreement must rest upon the consideration of the release of Watson from the arrest. And there is no proposition of law better settled than that a contract entered into for such a purpose, and resting upon such a consideration, is void. See Shaw vs Spooner, 9 N. H. 197, 32 Am. Dec. 348; Town of Hinesburgh vs Summer, 9 Vt. 23, 31 Am. Dec. 599. The defendant, by that contract, took neither the title to the cattle which he now claims, nor right to be paid the money, and his possession of the cattle is wrongful.

But even if that part of the agreement relating to the redemption had been valid, it would make no difference, for it is the law that, if any part of the consideration of a contract is for the release of a prisoner, the whole will be void. In the case of Lindsay vs Smith, 78 N. C. 328, 24 Am. Rep. 463, which was a case where the plaintiff was under indictment for maintaining on his land a public nuisance, to wit, a pond of stagnant water, and agreed to pay the defendant a certain sum, in consideration of which the defendant agreed to ditch the plaintiff's land and stop the prosecution of the indictment, it was held that the agreement to stop the prosecution was illegal, and rendered the entire contract void. In discussing the question, the court say: "Defendants' counsel contend with great ingenuity that there are two covenants in this sealed instrument, and that they are divisible, part being good and part bad; that the contract of the defendants is to do two things—first, to dismiss the indictment, which is illegal and void; but, second, to cut and keep up the ditch, which is legal and valid, and is the contract for the breach

of which the action is brought. In regard to this proposition, the general rule is that if there are several considerations for separate and distinct contracts, and one is good and the other bad, the one may stand and be enforced, although the other fails under the maxim 'Utile per inutile non vitiatur.' But where there is but one entire consideration for two several contracts, and one of these contracts is for the performance of an illegal act, the whole is void, as where one sum is to be paid for the doing of a legal and illegal act." Nor does it matter that the consideration was for the release of a third party. In the case of Peed vs McKee, 42 Iowa, 689, 20 Am. Rep. 631, the defendant's son having been guilty of the crime of embezzlement, defendant executed a mortgage in settlement of the amount embezzled, in consideration of an agreement that the son should not be prosecuted. The court held that the consideration was illegal, and the mortgage void. And it matters not whether the offense had been committed or not. Lindsay vs Smith, supra; Garner vs Qualls, 4 Jones, Law, 223. Upon the illegality of contracts and agreements founded upon the consideration of a release from arrest, the Supreme Court of New Hampshire, in the case of Shaw vs Spooner, supra, say: "The course and duty of Shaw, the creditor and agent, was, then, a very plain one. Having thus procured the arrest, he should have taken the defendant to Massachusetts, and have caused him to be there arraigned and tried for the alleged offense. For no other purpose had he the right to arrest him in the manner in which it was done. If, instead of this, he caused the defendant to be arrested, and made use of the process in any manner to compel the defendant to settle, or to give the note now in suit, this was a use of the process wholly unauthorized by law, and the note thus procured is void. Richardson vs Duncan, 3 N. H. 508. * * * Indictments and handcuffs furnish very cogent reasons for settlement, when used for that purpose."

But if this agreement were a legal one when made, the

result would be the same, because it cannot be denied but that the after-conduct and the language of the defendant at the home of plaintiffs one week after the making of the first agreement was a renunciation and a breach of the conditions of the original agreement, leaving it in such a condition that, if valid when made, the plaintiffs, because of the renunciation and breach, would be at liberty to treat it as annulled, and bring their suit for the possession of the property, as if it had never been made. Watson was again put under arrest, and the plaintiffs (husband and wife) were also arrested and held in their own home during the whole of one night, guarded by these men with their guns and pistols. They were told, in substance, that they were felons, and would be carried to and locked up in jail if they did not transfer their title to the cattle to the defendant and leave the country; and under these conditions, and this pressure and intimidation, the second agreement was made, and the parties were released. The rearrest of Watson was of itself such a breach of the original agreement as to entitle the plaintiffs to consider it as annulled, and the stipulation that the title to the cattle was to at once vest in the defendant was a cancellation of that part of it which related to the redemption; and the defendant thereafter held his possession as the absolute owner of the cattle, without, as far as he was concerned, any right of redemption. He was holding them under this last contract, without any relation to, and in violation of, the original agreement; and, as the last contract required the payment of no money, if both the contracts had been originally valid there would have been nothing to tender. And therefore in this case no tender of the money before bringing suit was necessary.

As to the necessity of a demand on the part of the plaintiffs for the possession of the cattle before bringing their suit, there are two reasons why this should not have been required: First, because, as heretofore shown, the property was wrongfully

and unlawfully taken by the defendant; and, second, because his possession and use of the cattle, as set up in his answer, was under a claim of ownership. Mr. Cobbey, in his work on Replevin, lays down the rule as follows: "When the complaint alleges property in the plaintiff, and that defendant wrongfully detains it, it is not necessary to allege a demand; and plaintiff may prove either a wrongful taking, a demand and refusal, or facts which render a demand unnecessary, where the original taking was lawful. When one who has no title retains goods in his possession under claim of ownership, his possession is wrongful, and no demand is required. When the plaintiff's case depends upon a wrongful detention, without a wrongful taking, an averment in the complaint of a demand and refusal is unnecessary. No demand need be made upon one who comes wrongfully into possession of personal property previous to an action by the owner to recover possession thereof. * * * When the defendant in his answer sets up a claim of ownership and right of possession in himself, and demands a return of the property, and proceeds to trial on this issue, he thereby waives the objection that no demand was made. Such affirmative claim of ownership is sufficient evidence that demand is not relied on, and would have been unavailing. Where both parties claim title to personal property and the right of possession thereunder, a demand is not necessary to enable either to maintain replevin against the other. When plaintiff's right is contested by defendant on a claim of superior right, the defendant cannot set up a want of demand as a reason for his failure to surrender. This claim of ownership by defendant is inconsistent with the theory that he might have surrendered them on demand, and removes the necessity for demand if one had been necessary." In this case the taking was wrongful, the possession was wrongful, and both parties by their pleadings claimed ownership, and therefore no demand before bringing suit was necessary. We therefore hold that the court below erred in peremptorily charging the jury to find for defendant on the

grounds that the money had not been tendered, and that demand for possession of the property sued for had not been made by plaintiff, before bringing suit.

The judgment of the court below is reversed, and the cause remanded.

TOWNSEND and GILL, JJ., concur.